161 So.2d 903 (1964)
James M. SMITH et al.
v.
INSURANCE COMPANY OF the STATE OF PENNSYLVANIA et al.
No. 6068.
Court of Appeal of Louisiana, First Circuit.
March 2, 1964.
Rehearing Denied April 6, 1964.
*905 Durrett, Hardin, Hunter, Dameron & Fritchie, by Calvin E. Hardin, Jr., and Hunt & Covington, by Elayn Hunt, Baton Rouge, for appellant.
Borron, Owen, Borron & Delahaye, by G. T. Owen, Jr., and Horace C. Lane, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
This is one of four actions arising from a single automobile accident and consolidated for trial below. After trial in the lower court separate judgments were rendered in each cause. In the instant matter we shall dispose of those issues common to these consolidated suits including the actions entitled, Martz v. Insurance Company of the State of Pennsylvania, La.App., 161 So.2d 920, Royal Indemnity Company v. Insurance Company of the State of Pennsylvania, and Leach, et al. v. Insurance Company of the State of Pennsylvania, et al., La.App., 161 So.2d 920, Numbers 6069, 6070 and 6071, respectively, on the docket of this court.
The accident occurred shortly after midnight in the early morning hours of Sunday, October 2, 1960, at the intersection of U. S. Highway 61, commonly known as the Baton Rouge-New Orleans "Airline Highway" and Louisiana Highway 431 locally known as "Brittany Road", said intersection being situated approximately one mile north of Sorrento, in Ascension Parish. Involved in the accident was a 1960 Valiant being driven in a southerly direction along U. S. 61 by its bailee, Henry A. McBroom, Jr. (who died as a result of injuries sustained in the collision), and a 1960 Buick being driven in a westerly direction on Brittany Road by defendant James R. Poche, minor son of defendant Vernon V. Poche, then State Police Lieutenant in the employ of the State of Louisiana, Department of Public Safety, Division of State Police, (sometimes hereinafter referred to simply as "the State" or "the Department"). Liability coverage on the Valiant was carried by defendant State Farm Mutual Insurance Company whose coverage of said vehicle is conceded, but which said concern was released from liability upon the trial court finding the driver of said vehicle, McBroom, was free of negligence proximately causing the accident. The Buick automobile, owned by the Department was insured by defendant, The Insurance Company of the State of Pennsylvania (sometimes hereinafter referred to simply as "Penn" or "Pennsylvania") which denies coverage under the omnibus insurance clause contained in its policy on the ground the vehicle was being *906 driven without the permission of the named insured.
Plaintiffs in the instant case, Mr. and Mrs. James M. Smith, who were occupants of the rear seat of the Valiant, sue Pennsylvania, State Farm, Vernon V. Poche and the minor, James R. Poche, for injuries received in the accident. Lieutenant Poche and his son have filed herein a third party petition against Pennsylvania which declined to defend the action against them and denied coverage on the ground herein previously stated. Our learned brother below denied motions for summary judgments filed on behalf of Pennsylvania but this issue is not before us on this appeal inasmuch as Pennsylvania has neither appealed nor answered the present appeal.
Following trial of these consolidated causes, our esteemed brother below rendered judgment in this matter dismissing plaintiffs' demands against State Farm and Pennsylvania and granting judgment in plaintiffs' favor against defendants, Vernon V. Poche and James R. Poche, both of whom have appealed.
The suit of Royal Indemnity Company is against defendant Pennsylvania and the Poches and seeks recovery of damages paid by Royal as collision insurer of the Valiant. Plaintiff's demand was rejected as against all defendants save and except the Poches.
Mrs. McBroom, who occupied the front seat of the Valiant, filed suit against State Farm, Pennsylvania and the Poches, praying for damages for the death of her husband, Henry A. McBroom, as well as personal injuries sustained in the accident. Her said demands were rejected as to all defendants excepting the Poches and she has appealed.
The final action, that instituted on behalf of the minor, Jeanne Leach, who occupied the rear seat of the Valiant with Mr. and Mrs. Smith, is against defendants, State Farm, Pennsylvania and the Poches. Her suit was likewise dismissed as to all defendants except the Poches and an appeal has been taken herein on her behalf.
Plaintiffs-appellants, excepting Royal Indemnity Company, alternatively pray for an increase in the awards made in their favor against the Poches in the event State Farm and Pennsylvania, or either of said insurers, are cast on this appeal. Their contention that the awards made by the trial court were only in the amount of their respective special damages because of the limited financial status of the Poches, is amply supported in the record.
All plaintiffs-appellants, excepting Mrs. McBroom, who instituted action under her maiden name, Martz, maintain decedent McBroom was guilty of negligence proximately causing the accident and that his said negligence occurred jointly with that of young Poche. Mrs. Martz and State Farm argue that young Poche was solely at fault. On the other hand, the Poches contend the Poche youth was free of fault and that the accident occurred solely because of the negligence of McBroom, consequently judgment in favor of plaintiffs should have been against State Farm alone. In the alternative, the Poches maintain judgments should have been rendered against them in solido, with State Farm. The Poches are joined by all plaintiffs in the position that to the extent the father and son are liable to plaintiffs, Pennsylvania is equally liable as insurer of the Buick automobile being operated by the son.
The final position of the Poches is that Pennsylvania was legally obligated to defend these actions against them and, for failure to do so, is responsible to them for all legal fees incurred in the defense and appeal of these several suits. Pennsylvania, content with its denial of coverage and disclaimer of any obligation whatsoever under its policy with respect to the accident in question, takes no position regarding the alleged negligence, fault or cause of the accident, or the responsibility of the drivers involved therein.
*907 At the scene of the accident U. S. Highway 61 is a divided, four-lane, concrete highway running in a generally northerlysoutherly direction. Each of the traffic lanes is twelve feet in width, the two northbound lanes being separated from the opposing southbound lanes by a grass neutral ground estimated to be 24 feet wide. The inferior cross road, Louisiana Highway 431, is a two-lane hard surface asphalt roadway running in an east-west direction. Approximately three hundred feet east of Airline Highway the subordinate road makes a long sweeping curve towards the south. At the northeast corner of the intersection in question is situated a building housing a combined gas station and store which structure, the evidence reveals, obstructs to some extent the view from Brittany Road of traffic upon Airline Highway approaching the intersection from the north. On the north side of Brittany Road there is a sign warning traffic proceeding westerly along said highway of the intersection and a stop sign approximately 120 feet east of the intersection admonishing traffic upon the inferior roadway to come to a stop prior to entering the intersection. The stop sign is near the aforesaid commercial establishment situated at the northeast corner of the junction.
The accident occurred when young Poche, proceeding westerly along the inferior highway attempted to cross Airline Highway. The Buick automobile was struck in the vicinity of its right front door by the left front of the Valiant which latter vehicle was traveling in the left or inside lane of southbound Airline Highway traffic immediately preceding the collision. The impact, however, occurred in the right or outside southbound lane of the Airline Highway when McBroom veered his vehicle to his right in an effort to avoid the impending collision.
According to young Poche, he stopped at the stop sign on Brittany Road prior to entering the intersection. His testimony leaves the clear impression that at the time he thus stopped his view of approaching traffic from the north on Airline Highway was obstructed and impeded by the gas station and store situated at the northeast corner of the intersection. After stopping he accelerated his vehicle to cross the intersection and upon entering the northbound lanes of Airline Highway observed the McBroom vehicle approaching from the north or his right. At this point he considered the distance of the oncoming automobile sufficient that he could safely negotiate the intersection in advance of McBroom's vehicle. Upon reaching the neutral ground, however, he realized he could not clear the intersection ahead of the southbound vehicle and applied his brakes firmly in an effort to stop. Notwithstanding his action in this regard, the accident occurred.
John Warren Grand, a passenger in the Buick being driven by the Poche lad, in essence testified he was seated on the right of the front seat facing the driver and that he was unaware of the attending circumstances. He did not notice the stop sign at the intersection nor did he recall whether his host stopped before entering the intersection. His testimony further shows he was not cognizant of the approach of the McBroom vehicle upon the main highway.
Mrs. Martz (McBroom) testified she was seated beside her husband leaning back with her eyes closed and her head resting upon the seat of the car when she suddenly felt the brakes being applied and the car swerving to the right. She instantly opened her eyes and observed "a sort of a black blur in front of the car." She was unable to testify further concerning the occurrence of the accident. Mr. and Mrs. Smith were unable to recall any of the details of the accident because of their injuries and consequent amnesia. Upon the recommendation of her physician, Miss Leach was not called to testify. A stipulation appearing of record indicates she has no recollection concerning the occurrence of the accident.
*908 Lucien Maurice Provosty, a Tulane University law student, testified he was a passenger in the rear seat of an automobile being driven by one James Joseph Reiss, Jr. traveling southerly on Airline Highway behind the McBroom vehicle. On the front seat beside the driver was Reiss's date, Miss Ann McDonald. To Mr. Provosty's left on the rear seat was Miss Maria Pratt while on his right was seated Miss Ann Pratt, who subsequently married Mr. Provosty.
According to Mr. Provosty the vehicle in which he was traveling had been following the McBroom vehicle for some time at an estimated speed of 60 miles per hour, the Reiss vehicle traveling in the right or outside southbound lane enroute to New Orleans from Baton Rouge after the L.S. U.-Baylor football game. The speeds of the respective vehicles were such that the Reiss vehicle was slowly overtaking the McBroom car whose speed Provosty estimated at between 55 and 60 miles per hour. When the Reiss car reached a point approximately 150 yards behind the Valiant, Provosty observed the Poche vehicle on Brittany Road about 25 feet from the Airline Highway approaching the intersection at a high rate of speed which he estimated as much as 60 miles per hour. As the Buick entered the intersection, Provosty exclaimed, "Look, there's going to be an accident." A fraction of a second before the impact he noted the brake lights of the McBroom vehicle flash on and an attempt on the part of the driver to veer to the right. Simultaneously with the attempt of McBroom to apply his brakes and cut to the right, the driver of the Poche vehicle attempted to veer to his left. Notwithstanding these maneuvers the cars collided. The initial contact was between the left front of the Valiant and the right side of the Buick between the right front door and hood. At the moment of impact the right front wheel of the Valiant was off the paved portion of the highway. Following impact, the McBroom vehicle spun around clockwise in a complete circle and both vehicles came to rest south of the Brittany Road and west of the Airline Highway facing in a generally southerly direction. The Reiss vehicle swerved around the colliding vehicles and stopped on the shoulder of the highway south of the scene without in any manner becoming involved in the accident. Both Provosty and Reiss attempted to render assistance to those persons injured in the accident.
The testimony of Mr. James Reiss is substantially similar to that given by Mr. Provosty excepting the rather minor details hereinafter noted. He stated that in addition to seeing the brake lights on the McBroom vehicle, he could also see the rear end of the Valiant rise somewhat showing that it was "giving a heavy braking effect." His observation in this regard was made right after the Buick entered the "neutral ground section of the highway." He further observed that the Valiant had just begun to turn right when it was struck. Following the initial impact the right side of the Buick collided side by side with the left side of the Valiant. Prior to the accident Reiss was driving at between 60 and 65 miles per hour. He had been following the Valiant for several minutes and recalled seeing its lights. Reiss estimated the speed of the Buick at approximately 60 miles per hour when it entered the highway. He did not observe Poche stop before the latter entered the intersection.
At the time of the trial Miss Ann McDonald was attending Yale University Graduate School and was unavailable as a witness. It was stipulated that Miss Pratt and Mrs. Provosty, if called as witnesses, would testify substantially the same as Mr. Reiss and Mr. Provosty.
Lieutenant William J. Wisner of the Louisiana State Police testified he investigated the accident a few hours following its occurrence. His investigation revealed the Poche vehicle laid down 22 feet of skid marks prior to the point of impact. The McBroom vehicle made no skid marks excepting *909 a tire mark perpendicular to the line of travel from the point of collision indicating the front of the Valiant was propelled to the right.
Appellants' contention McBroom contributed to the accident by driving at an excessive rate of speed is deserving of but little comment under the circumstances shown. The speed limit on the Airline Highway is shown to be 65 miles per hour. The evidence reflects McBroom was traveling at perhaps 60 miles per hour and under favorable conditions so far as concerns the weather, visibility, the condition of the highway and the traffic upon the highway at the time. The lights of his vehicle were burning and there is nothing to indicate he did not have full control of the Valiant.
On this appeal it is principally contended McBroom should be held guilty of negligence proximately causing the accident because (1) he was not keeping a proper lookout and should have observed that the Buick would not accord him the right of way to which he was entitled, and (2) that he should have taken some action to avoid the collision. State Farm, however, vigorously maintains McBroom was entitled to rely on the presumption that a vehicle on an inferior roadway will yield to the motorist on the favored highway and therefore had a right to proceed upon the assumption Poche would stop before entering the southbound lanes of Airline Highway. State Farm also argues that McBroom did in fact attempt to avoid the accident by applying his brakes and cutting his car sharply to the right.
That McBroom did in fact apply his brakes prior to impact is an inescapable conclusion under the circumstances related. Not only Mrs. Martz so testified, but she is corroborated in this important aspect by the testimony of the two totally disinterested witnesses, Provosty and Reiss. It also appears clear beyond doubt that when McBroom realized Poche would not stop and an accident was imminent, he attempted to divert his vehicle to the right in addition to forcefully applying his brakes. That no skid marks were made by the Valiant appears of little moment considering the testimony of Reiss and Provosty clearly indicates that the impact occurred within a fraction of a second after McBroom applied his brakes and attempted to veer to his right.
The contention that McBroom was negligent in not observing that Poche would enter the intersection without stopping and therefore McBroom should have been alerted to the danger, is predicated primarily on the fact that Provosty observed Poche before the Buick entered the highway and McBroom should have done the same in time to avoid the impending accident.
All counsel concede applicability of the rule that a motorist traveling upon a right of way street or thoroughfare is entitled to assume that vehicles on subordinate roadways will respect his superior right of way. Koob v. Cooperative Cab Co., 213 La. 903, 35 So.2d 849; Walker v. State Farm Mutual Automobile Ins. Co., La.App., 137 So.2d 685. It is equally well settled that a motorist is entitled to rely upon such presumption until, in the exercise of ordinary, reasonable care he sees or should see that the motorist on the inferior highway will not yield the right of way. Randall v. Baton Rouge Bus Co., Inc., 240 La. 527, 124 So.2d 535. In such instances each case must be decided in the light of its own peculiar facts and circumstances. Randall v. Baton Rouge Bus Co., Inc., supra.
In the case at bar we are concerned with an accident which occurred on an open four-lane highway under favorable conditions insofar as concerns traffic, the weather and the condition of the highway. The motorist on the favored highway was traveling within the lawful speed, after midnight, with his lights burning. The motorist on the subordinate highway was traveling at an excessive rate of speed and unlawfully attempted to preempt the intersection *910 despite the obvious presence of a motorist lawfully proceeding upon the superior highway at such proximity to the intersection as to make the former's entry into the intersection extremely hazardous.
The most serious argument advanced by appellants against McBroom is that if Provosty detected the Poche vehicle before it entered the highway, McBroom should have done likewise had he been keeping a proper lookout. The answer to the foregoing argument lies in the fact that McBroom did in fact detect the Poche vehicle before the collision and attempted to avoid the accident by both applying his brakes and trying to veer to his right. He was under no obligation to take any evasive measures until such time as it became apparent to him as a reasonably prudent driver that Poche would not in fact stop. Had he observed Poche when Poche stopped at the stop sign (as Poche contends he did) he would have been justified in assuming Poche would remain stopped. Had McBroom observed Poche after the latter passed the stop sign he would have been entitled to assume Poche would stop either in the northbound lanes or within the neutral ground and allow the Valiant to proceed without incident. Of considerable significance is the fact that McBroom was much nearer the intersection than the Reiss vehicle and did not have the same wide range of vision as the occupants of the Reiss car. What the occupants of the Reiss car could observe in the comparatively wide panoramic view of the intersection which they enjoyed from a distance of 150 yards to the north, McBroom could not see as fully from his position much nearer the intersection. McBroom would have had to turn his head to the left to see what Provosty could see at a glance merely by looking straight ahead. The record clearly shows that when McBroom did observe the danger he reacted instantly by both applying his brakes and attempting to turn to the right. His reaction was certainly immediate and reasonable. Allowing for reaction time we believe McBroom must have applied his brakes while Poche was still in the northbound traffic lanes. Although Provosty estimated the speed of the Buick at approximately 60 miles per hour, we believe Poche's speed was somewhat less than that figure but nevertheless excessive under the circumstances. There is no reason to reject Poche's testimony that he stopped at the stop sign. His testimony convinces us he truthfully related the events leading to the accident as he recalled them. He frankly conceded he thought he could cross the intersection ahead of the Valiant but suddenly realized he was mistaken after entering the intersection and then attempted to stop. He did not indict McBroom of speeding. It appears clear, therefore, Poche could have hardly attained a speed of 60 miles per hour in the distance of approximately 120 feet he traveled before applying his brakes. Since the record established the stop sign was 120 feet from Airline Highway and the Buick laid down 24 feet of skid marks preceding the point of impact, it follows, allowing for reaction time, Poche must have commenced his reaction at about the time his vehicle reached the eastern edge of the paved surface of Airline Highway. We believe the circumstances of the instant case closely akin to those obtaining in Walker v. State Farm Mutual Automobile Ins. Co., La.App., 137 So.2d 685. We hold, therefore, McBroom was free of negligence proximately causing the accident and further conclude the sole proximate cause of the accident was the negligence of Poche in failing to yield the right of way to the Valiant and attempting to enter the intersection at a time when the motorist on the favored highway was so near as to make Poche's attempted negotiation of the intersection extremely dangerous. Accordingly, the judgment of the honorable trial court absolving defendant State Farm Mutual Automobile Ins. Co. from liability herein will be affirmed.
*911 We shall next consider the alleged liability of defendant, Pennsylvania, under the omnibus clause contained in the policy issued the Department covering the Buick automobile being driven by young Poche. The policy in question lists the named insured as the "State of Louisiana, Department of Public Safety, Division of State Police." The policy contains, inter alia, an Automobile Fleet Endorsement, a hired automobiles endorsement and an employers' non-ownership liability endorsement. The limits of liability are $20,000$100,000 for bodily injury and $10,000 property damage. The premium, computed on a bi-annual basis, is $52,330.26.
The basis of Pennsylvania's denial of coverage is the following policy provision:
"III. Definition of Insured: (a) With respect to the insurance for bodily injury liability and for property damage liability the unqualified word `insured' includes the named insured and, if the named insured is an individual, his spouse if a resident of the same household, and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or such spouse or with the permission of either. * * *" (Emphasis added.)
Succinctly stated, the position of Pennsylvania is that young Poche did not have permission of the named insured to use the insured vehicle consequently the Buick was not covered during his use thereof. Pennsylvania's denial of coverage is not predicated on the contention that the use to which the vehicle was being put at the time of the accident was excluded from coverage. On the contrary, Pennsylvania concedes that once permission of the named insured is granted a permittee, a deviation by the permittee from the use authorized by the named insured does not remove the vehicle from the protection afforded by the omnibus clause.
It is undisputed that at the time of the accident Lieutenant Poche was in the employ of the Department of State Police and had been so engaged for several years prior thereto. At the time of trial he had been promoted to the rank of Captain. On the date of the accident he was in charge of a group of approximately nine officers whose duties consisted solely of rendering service to the Governor of the State of Louisiana which said contingent was appropriately referred to as the "Mansion detail." Specifically it was the function of these officers to remain on 24 hour duty at the governor's official residence in Baton Rouge and serve as telephone operators, receive and greet visitors and guests, maintain records of appointments, guard the mansion and its grounds, serve as body guards to the governor, his immediate family and state dignitaries and chauffeur the governor, his family and important state officials calling at the official governor's residence, whenever ordered or directed to do so. Five or six vehicles of the Department of State Police were permanently assigned to the Mansion detail, including the Buick involved in this accident. Of the several cars delegated to such use all save the Buick (which was assigned to the personal and exclusive use of Lieutenant Poche) remained at the mansion at all times except only when in use by the governor, his family or some state official. The Poche Buick, however, was used by Poche in traveling from his residence back and forth to the mansion and was kept by Poche in his possession whenever he was not on duty. It is clear beyond the shadow of a doubt Poche had unlimited authority to use the Buick as he saw fit for his personal use so long as he was driving the vehicle himself. The crux of this entire matter is whether, under the circumstances he was authorized to delegate this permission to a third party, namely, his son.
*912 In the light of the foregoing circumstances which are readily conceded by all concerned, we shall proceed with an examination of the facts and circumstances attending Poche's giving his young son permission to drive the vehicle.
A few hours preceding the accident, Lieutenant Poche had driven the Governor and his party (in the Buick subsequently involved in this accident) to the L.S.U.-Baylor football game and back to the Governor's official residence thereafter. Before attending the game Mrs. Poche drove her own car behind the mansion, parked it there, walked to a bus stop near a hotel in the vicinity and took a bus to the football game. Upon returning by bus from the game she waited at the hotel until met there by her husband who then drove her to the mansion where she intended to pick up her own car and proceed to her home followed by Lieutenant Poche in the state owned Buick. Upon arriving at the mansion, however, Poche's personal car would not start so it was left in the mansion parking lot. Lieutenant Poche then drove himself and his wife to their home in the state owned vehicle. Upon arriving at their home in Goodwood Subdivision at approximately 11:00 P.M., they found awaiting them their son James and his date. Lieutenant Poche permitted his son to use the vehicle to take his date home. The testimony reveals she lived approximately three miles distant from the Poche residence. The accident occurred approximately one and one half hours later near Sorrento, a considerable distance from Baton Rouge. After taking his date home, young Poche met his guest passenger, Grand, at an establishment known as Gold Place Lounge & Bar situated on Brittany Road. While they were enroute from the lounge to Airline Highway (their destination at the time not being disclosed by the evidence), the accident occurred.
There appears in evidence a copy of the Louisiana State Police Manual setting forth rules and regulations governing the conduct of employees of the Department. Included therein are the following rules:
"SECTION XIII, CARE AND USE OF PROPERTY AND EQUIPMENT,
"Paragraph 5:
"Motor Equipment
"No member of the State Police shall use any official issued vehicle for any purpose other than in the discharge of his duties. All members of the State Police shall be personally responsible for all vehicles assigned to or used by them.
"SECTION XV, MOTOR EQUIPMENT
"Paragraph 1:
"Use only for Police Work
"Motor equipment is to be used for police work only."
* * * * * *
"Paragraph 4:
"Operation by Civilians
"Civilians will not be allowed to operate department owned motor equipment."
"Paragraph 5:
"Transportation of Civilians
"Civilians will not be transported in department owned vehicles except by permission of the Superintendent or the commanding officer. This does not apply to person in custody or persons to whom immediate aid is being rendered."
Plaintiffs-appellants maintain Lieutenant Poche was authorized to grant permission to his son sufficient to constitute the youth an insured because (1) no individual being named in the policy and the owner being a political corporation capable of acting only through its employees, Lieutenant Poche is *913 in fact the named insured since he had absolute control of the vehicle and was the only person who could grant another permission to use it; and (2) the Department's rules prohibiting civilian use or operation of vehicles were merely directory or advisory insofar as concerns vehicles assigned to the Mansion detail considering the peculiar use to which such vehicles were put. From this premise appellants contend it was contemplated the rules would serve only as a "guide" and not be adhered to with respect to such vehicles consequently, in effect, there was no prohibition against Poche permitting third persons to drive, therefore, having unlimited use of the Buick, Poche possessed the implied consent of the Department to permit others to drive the vehicle. It is further contended that if the rules were in fact intended to apply, their frequent violation was countenanced to such effect it was no longer operative and the Department is considered to have consented to such violations.
The contention Poche was in essence the named insured is patently without merit. The policy clearly states the named insured is the State of Louisiana, Division of Public Safety, Department of State Police. Granting that a corporation may act only through its agents, representatives and employees, such persons may not act contrary to express rules and regulations and thereby bind the corporation except under unusual and extraordinary circumstances, a discussion of which is not essential to solution of the present problem. We likewise find no merit in the argument that Poche was answerable to no one in his use of the vehicle and therefore was the only one who enjoyed the right of permitting others to drive the car in question. The record clearly reveals the vehicles assigned to the governor's residence were assigned subject to supervision of the Director and Superintendent of the Department. Although Poche signed out for each vehicle he was accountable therefor to the Director and Superintendent.
Although there is evidence of record indicating the vehicles assigned to the governor's residence were daily used in the transportation of civilians such as members of the governor's family and state office holders of high rank, it is clear that with the sole exceptions hereinafter noted the vehicles were driven by employees of the Department. The exceptions above referred to consist of the Governor's wife and son who infrequently drove the vehicles themselves. It is also clear that in such use the members of the Governor's family did not seek or need permission of Lieutenant Poche or any other member of the Mansion Detail. In essence the record shows that neither the Governor's wife nor son were ever questioned by anyone whatsoever with respect to their wishes in the use of the vehicles. The clear and unmistakable import of the testimony of Lieutenant Poche, the Department's Director and its Superintendent is that the Governor's wife and son were exceptions to the rule prohibiting civilian driving inasmuch as the vehicles were assigned to the official residence, inter alia, for their use. In effect the record indicates they were permittees not with the consent of Lieutenant Poche but notwithstanding his approval or disapproval. It further appears the permission which these parties enjoyed was that of the Director and Superintendent and Poche was without right, power or authority to grant or refuse them such permission.
It appears that Lieutenant Poche had been assigned to this particular duty for several years and prior to the incident in question had never previously or since given any member of his family permission to drive a department owned vehicle. In this regard he was corroborated by the Director and Superintendent who likewise testified they had never permitted any members of their families to drive a vehicle belonging to the Department because it was against the rules. While there is some testimony to indicate the Director and Superintendent, as well as Poche, considered *914 the rules as a "guide" they unanimously agreed it was not customary for civilians to drive such vehicles. While Poche concedceded he had no authority to permit his son to drive, he nevertheless attempted to justify his conduct by stating that he felt he had such authority "under the circumstances." We find no merit in this contention because the record reflects he had no such authority express or implied but rather was specifically prohibited from doing so under the rule which he and all the other witnesses acknowledge was rigidly adhered to with the sole exception of the hereinabove named parties. In addition the Director and Superintendent testified that with this one exception they knew of no civilian driving a department vehicle other than the members of the governor's family.
We therefore believe it clear that Lieutenant Poche was a permittee within the meaning of the hereinabove quoted omnibus clause inasmuch as he had express permission of his superiors to use the vehicle and had been vested by them with general control, supervision and care of the Buick automobile involved in the accident. The question, therefore, is simply whether, under the circumstances, he possessed such control and authority over the automobile that he could properly delegate permission for its use to a third party or second permittee.
In the recent case of Anderson v. Adams, La.App., 148 So.2d 347, we indulged in a detailed review of the pertinent jurisprudence including Rogillio v. Cazedessus, 241 La. 186, 127 So.2d 734, and Hurdle v. State Farm Mutual Automobile Ins. Co., La.App., 135 So.2d 63. We do not deem it necessary to reiterate at length the views expressed therein. We consider it sufficient to state the jurisprudence appears well settled in numerous pertinent respects which we shall succinctly set forth. Only the named insured may confer the permission necessary to effectuate the omnibus clause. Rogillio v. Cazedessus, supra. Where the initial permission obtained from the named insured is silent as to the permittee's right or authority to delegate use of the vehicle to another, permission of the named insured may be implied where in using the vehicle the second permittee serves some purpose, benefit or advantage of the first permittee or the named insured. Perrodin v. Thibodeaux, La.App., 191 So. 148; Boudreaux v. Cagle Motors, La.App., 70 So.2d 741.
Where the original permittee is expressly forbidden and prohibited from delegating use of the vehicle to a third party or second permittee, the initial permittee cannot delegate such authority and any use by a third party in violation of such instructions does not fall within the policy protection. Longwell v. Massachusetts Bonding & Ins. Co., La.App., 63 So.2d 440.
If an original permittee has general use and control of a vehicle but is prohibited from permitting its use by another, a third party or second permittee using the vehicle with permission of the original permittee may nevertheless be covered provided his use serves some purpose, benefit or advantage of the named insured. Thomas v. Peerless Insurance Company, La.App., 121 So.2d 593. (Emphasis supplied by the court.)
Where an original permittee having general use and control of a vehicle is forbidden to delegate its use to a third party but violates such instructions to the knowledge of the named insured who makes no protest, the named insured is held to have impliedly consented to such use by such third party irrespective of the nature of the use of the vehicle by the second permittee. Coco v. State Farm Mutual Automobile Insurance Co., La.App., 136 So. 2d 288; Thomas v. Peerless Insurance Co., supra.
Learned counsel for plaintiffs-appellants maintains the instant case falls within the rule of Brooks v. Delta Fire & Casualty Co., La.App., 82 So.2d 55, wherein notwithstanding *915 a permittee allowed a third party to drive contrary to the instructions of the named insured, the second permittee was held covered by the policy omnibus clause. The Brooks case, supra, is clearly distinquishable from the case at bar inasmuch as in the cited case the named insured was fully aware the permittee would be accompanied by a third party whose sole duty was to assist the permittee in the care of the permittee's young child which was being taken to a hospital for examination. The case does not hold, as contended by counsel for appellants-plaintiffs that consent of the initial permittee contrary to express instructions from the named insured is sufficient to invoke the omnibus clause with respect to the second permittee. On the contrary, the case expressly held that because the named insured was cognizant of the presence of the third party in the vehicle for the purpose of assisting the permittee, the named insured was held to have impliedly consented to such third party's driving the vehicle in an emergency.
In the case at bar Lieutenant Poche, though manifestly a permittee having general use and control of the vehicle, was nevertheless expressly and explicitly prohibited from permitting non-employees of the Department to drive the vehicle. Therefore he had no authority to delegate the use of the vehicle to his son. Longwell v. Massachusetts Bonding & Ins. Co., La.App., 63 So.2d 440.
Neither did young Poche's use of the automobile fall within the rule announced in Thomas v. Peerless Insurance Company, La.App., 121 So.2d 593, inasmuch as his use of the vehicle served no purpose, benefit or advantage of the named insured, the State of Louisiana, Division of Public Safety, Department of State Police.
Nor does the instant case come within the purview of Coco v. State Farm Mutual Automobile Insurance Co., La.App., 136 So.2d 288, considering it appears Poche's superiors were completely unaware of his permitting a civilian to operate such vehicles contrary to instructions. Nor can any comfort be derived by plaintiffs-appellants from the fact that Poche was not disciplined by his superiors for such disobedience. The record clearly shows that while Poche was not disciplined his conduct in this regard was not condoned in that further violations were countenanced. On the contrary both Poche and his superiors testified this was the only instance, to their knowledge, before or since the accident, of a civilian being permitted to drive a department owned vehicle. This being the first and only violation of its kind, it cannot be argued the named insured was aware of such violations and failed to protest thus bringing the instant case within the rule of Coco v. State Farm Mutual Automobile Insurance Co. and Thomas v. Peerless Insurance Co., supra.
We conclude, therefore, the learned trial court properly held young Poche was not driving the vehicle with the permission of the named insured as contemplated by the terms and provisions of the omnibus clause.
Finally it is contended by plaintiffs-appellants that Lieutenant Poche was in fact using the vehicle at the time of the accident and therefore covered under the hereinabove quoted portion of the policy which in effect defines an insured as any person using the vehicle with the consent of the named insured. In this regard it is contended that a person may be using a vehicle although not operating it at the time. Based on this premise it is argued that since Lieutenant Poche admittedly had unrestricted use of the vehicle in the conduct of his personal affairs, in lending the car to his son, he was merely fulfilling a personal, family obligation and was in effect "using" the vehicle and therefore covered under the omnibus clause.
In support of the foregoing position counsel for plaintiffs has cited a New Jersey case, namely, Indemnity Ins. Co. of North America v. Metropolitan Cas. Ins. Co. of New York, 33 N.J. 507, 166 A.2d 355. It was therein held by the Supreme Court of *916 New Jersey that a driver who in effect was expressly prohibited by the named insured from operating the automobile but who nevertheless operated the vehicle while being used for a purpose permitted by the named insured, was an additional insured within the scope of the omnibus clause. The court held the word "use" in the phrase "the actual use of the automobile" denotes employment for some purpose of the user and is not synonymous with the word "operation" which connotes manipulation of the car's controls in order to propel it as a vehicle.
Esteemed counsel further maintains a similar distinction between "use" and operation has been recognized by the courts of this state as evidenced by the following language appearing in Bolton v. North River Insurance Company, La.App., 102 So.2d 544:
"In stating that the defendant would be responsible under the omnibus clause of the policy for the negligent act or acts of the passenger, Don Bolton, which might be established on the trial of the case as a proximate cause of the injury and damage to plaintiff, we are agreeing with the contention of counsel for plaintiff that Don Bolton at the time was `using' the motor vehicle under the liberal interpretation required of such clauses in an insurance policy, Pullen v. Employers' Liability Assurance Corp., 230 La. 867, 89 So.2d 373; Spurlock v. Boyce-Harvey Machinery, Inc., La.App., 90 So.2d 417, 422. Also 45 C.J.S. Insurance § 829, p. 902, `The use contemplated in a provision for coverage while an automobile is used with the owner's consent generally is regarded as not limited to physical operation or driving.' (Emph. added.) Also Sec. 4316(e), 7 Appleman, `Insurance Law and Practice' pp. 84-85, as supplemented by 1958 pocket part, pg. 25, wherein it states: `The term "use" is the general catch-all of the insuring clause, designed and construed to include all proper uses of the vehicle not falling within one of the previous terms of definition * * *. A person clearly could be using an automobile without operating it personally. So long as "use" as distinguished from operation, is with permission of the named insured, the insurer is liable for any accident.' Also Liberty Mutual Ins. Co. v. Steenberg Construction Co., 8 Cir., 1955, 225 F.2d 294; also the concurring opinion in the case of American Farmers Mutual Automobile Ins. Co. v. Riise, 214 Minn. 6, 8 N.W.2d 18, 19, decided by the Supreme Court of Minnesota."
The following language also appearing in Indemnity Ins. Co. of North America v. Metropolitan Cas. Ins. Co. of New York, supra, explains the basis of the decision therein reached by the New Jersey Court, to-wit:
"* * * The Appellate Division in the present case interpreted (Costanzo v. Pennsylvania Threshermen, etc., Ins. Co., 30 N.J. 262, 152 A.2d 589) to mean that in every case where someone other than the named insured's permittee is operating the car it is necessary to determine whether the insured's permittee had authority to delegate operation, and that if the named insured expressly or impliedly forbade such operation there would be no coverage. We did not intend to so hold."
It must be conceded, as contended by counsel for plaintiffs-appellants that our own appellate courts have recognized the principle that the term "actual use" as contained in an omnibus insuring clause relates to the use of the vehicle and not the identity of the driver. Thus in Bolton v. North River Insurance Co., La.App., 102 So.2d 544, it was held that a person may "use" an automobile without actually "operating" it in the sense that he is driving the vehicle as a means of locomotion or travel or employing its motive power as a source of energy. Based on this distinction the court held an insured who accidentally *917 slammed the car door on the hand of another person while the vehicle was motionless, was "using" the car within the meaning and intendment of the word "use" as appears in the omnibus clause. A similar conclusion was reached in Garvey v. Great Atlantic & Pacific Tea Co., La.App., 125 So.2d 634, which involved a chain store attendant who closed the door of an automobile on the hand of a child passenger while in the act of placing groceries in the vehicle. Donovan v. Standard Oil Co. of Louisiana, La.App., 197 So. 320, is also authority to the effect that the words "actual use" in such a policy refers to the use of the vehicle and not the driver. It is significant, however, that in the Donovan case, not only was the vehicle being used for the express purpose for which it was borrowed but in addition, there was no prohibition against the original permittee allowing a third party to drive the vehicle.
While we are in complete accord with the decisions in the Bolton, Garvey and Donovan cases, supra, we believe none are controlling herein because each is clearly distinguishable on its facts. In the Bolton and Garvey decisions, supra, the party making use of the vehicle was clearly an insured. In the Donovan case no restriction was placed on the permittee with respect to permitting others to drive. While the cited authorities do make the distinction noted, our careful consideration of said decisions reveals they go only so far as to recognize the distinction, and no farther. We do not detect therein any intention to embrace or adopt the New Jersey rule as proclaimed in the hereinabove cited decision from our said sister state. On the contrary, our review of the jurisprudence indicates our own courts have consistently adhered to the rule rejected by New Jersey, namely, if the named insured prohibits and forbids permission to the original permittee to delegate permission to third parties, there is no coverage when a third party operates the vehicle, Longwell v. Massachusetts Bonding & Ins. Co., supra, unless, of course, the attending circumstances bring the case within the exceptions to the rule set forth in Thomas v. Peerless Insurance Company, supra, and Coco v. State Farm Mutual Automobile Insurance Co., supra.
Although the protection of the omnibus clause extends to an insured who is "using" a vehicle although not actively engaged in operating it in the sense that he is utilizing it as a means of transportation or a piece of mechanical equipment, such right of use, under our jurisprudence, is not without limitation or restriction. We believe our jurisprudence compels the conclusion that such "use" as distinguished from mechanical operation of an automobile is limited to the permittee's own personal, individual use of the vehicle and cannot extend to such use thereof as is made by the permittee through the medium or agency of a third party notwithstanding express orders and instructions of the named insured to the contrary. To hold otherwise is to contravene established jurisprudence and violate the terms of the policy by permitting by indirection that which cannot be directly accomplished. For example, to hold as counsel advocates is to sanction the proposition that while young Poche was clearly not covered because the permission granted was contrary to the named insured's orders, nevertheless, the father is covered because he permitted a use which he had no power to authorize. Such a use, in our view, clearly extends coverage to a degree not contemplated and therefore does not constitute "use" within the meaning of the term "use" as contained in the policy.
We shall now consider the remaining issue, namely, the claim of defendants-appellants, Vernon V. and James R. Poche, against defendant, Pennsylvania, for expenses incurred in resisting these actions necessitated by the refusal of Pennsylvania to defend.
*918 The policy issued by Pennsylvania contains the following provisions:
"II. Defense, Settlement, Supplementary Payments: With respect to such insurance as is afforded by this policy for bodily liability and for property damage liability, the company shall:
(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; * * *."
It appears well established in our jurisprudence that failure of an insurer to defend a suit as contemplated by the policy renders the insurer liable for all expenses incurred by an insured in defense of the action, including reasonable attorney's fees. Kansas v. Sun Indemnity Co. of New York, La.App., 37 So.2d 621; Standard Surety & Casualty Co. of New York v. Perrin, La.App., 19 So.2d 783. The right to recover such expenses from the insurer extends to the insured's subrogee. Maryland Casualty Co. v. Marquette Casualty Co., La.App., 143 So.2d 249. See also 49 A.L. R.2d 694, "Consequences of liability insurer's refusal to assume defense of action against insured on ground that claim upon which action is based is not within coverage of policy."
There can be little doubt but that the duty of an insurer to defend its insured under a policy of liability insurance is of greater scope than the insurer's duty to pay. Notwithstanding judgment after trial in favor of the insured rejecting plaintiff's demands, the insurer is nevertheless liable for expenses incurred in defense of the action if the allegations of the petition taken as true would result in liability which the insurer is obligated to discharge upon behalf of the insured. Lang v. Jersey Gold Creameries, La.App., 172 So. 389.
In this regard we cite with approval the following language appearing in the Lang case, supra:
"* * * It is not entirely within the discretion of the insurer to determine which suits against the assured it will or will not defend. In the present suit, the trial court held that the petition disclosed a cause of action against the insured. It required a trial to determine the merits of the case. The suit is a serious one and we think one which the insurer was bound to defend under the covenants of its policy. The insurer has not the right to await the result of such a suit, before deciding whether it should defend it. It is not within its rights to say to defendant, even in cases whose outcome is doubtful that if plaintiff wins, the policy provisions will be binding, but if he loses, they are not binding."
Similarly, where the petition alleges facts which would place the claim within the coverage of the policy, the insurer cannot avoid the duty to defend upon its own determination that there is no coverage under its policy provisions. Kansas v. Sun Indemnity Co. of New York, La. App., 37 So.2d 621.
It is also well settled that the insurer's obligation to defend a suit against its insured, whether groundless or not, must be measured by the allegations contained in the complaint rather than by the out-come of the suit. Thus an unambiguous exclusionary provision of a policy fully justifies the insurer's refusal to defend an action in which the complaint, petition or declaration affirmatively alleges circumstances warranting invocation of such a contractual exclusion. C. A. Collins & Son v. Pope Bros. Steam Cleaning Co., La. App., 155 So.2d 278; Foreman v. Jordan, La.App., 131 So.2d 796; Superior Cleaners v. New Amsterdam Casualty Co., La.App., 116 So.2d 195. The foregoing rule obtains *919 even where subsequent litigation results in judgment holding the insurer liable under the policy coverage. Kelly v. United States Fidelity & Guaranty Company, La.App., 76 So.2d 116.
Where the defense of no coverage is "highly technical" it has been held the insurer must defend and may be called in warranty if it refuses. Sherman v. O'Sullivan, La.App., 164 So. 343. It is significant, however, that in the Sherman case, supra, the defense of lack of coverage was found to be without merit.
As to our own courts, the precise issue presented appears res nova considering we have not been cited nor have we found any authority decisive of the question of the insurer's liability for expense of defending an action against an alleged insured following the insurer's successful urging of its non-liability on the ground the alleged insured was not in fact an insured under the policy.
It is clear to this court that while, as a general rule, the obligation to defend an insured against an action, whether groundless or not, must be measured and determined by the allegations of the petition rather than the outcome of the litigation, an obvious exception thereto must be made in those instances wherein, notwithstanding allegations in the petition to the contrary, the insurer successfully urges the alleged insured is in fact not an insured under the policy. Such a conclusion was reached in Butler v. Maryland Casualty Co., 147 F.Supp. 391, decided by the Federal District Court for the Baton Rouge Division of the Eastern District of Louisiana. The rationale of the rule recognizes the obligation of the insurer to defend the insured against even a groundless claim, but before the rule may be applied it must be shown the defendant is in fact an insured, named or omnibus, under the policy. This must be so because the insurer is not obligated to provide a defense for a stranger merely because the plaintiff alleges the defendant is an insured or alleges facts, which, if true, would make defendant an insured. Just as the insurer may not decline the defense of an insured against a groundless claim, the insurer may not be compelled to defend an action against a party not entitled thereto under the policy provisions. Stated otherwise, the mere allegations of the plaintiff's petition may not create an obligation on the part of the insurer to defend where no such obligation previously existed.
The obligation of the insurer to defend an insured against a claim totally without merit, when the allegations of the petition, if taken as true, state a cause of action and place the claim within policy coverage, springs from the phrase "even if such suit is groundless, false or fraudulent" appearing in the policy. Such language leaves the insurer no alternative except to defend any action.
The instant case, however, poses the question to whom does the insurer owe its contractual obligation to defend a suit? We believe the answer is to be found in the above quoted policy provision "* * * defend any suit against the insured." The term "insured" includes the "named insured" (a party to the insurance contract) and a so-called "omnibus insured" (a third person for whose benefit coverage is extended under certain conditions). If the defendant is neither the named insured nor an omnibus insured there is clearly no obligation to defend regardless of the allegations of the petition and irrespective of the soundness or groundlessness of the claim asserted. To hold otherwise is to completely erase from the policy the qualifying phrase "against the insured", contained in Clause II(a) quoted above.
In the instant case the minor driver was not an omnibus insured as he did not have permission of the named insured to drive the vehicle. Nor was his father an insured because he was not using the vehicle at the time of the accident. It follows that the *920 trial court properly rejected the claims of defendants-appellants, Vernon V. and James R. Poche, against defendant Pennsylvania for attorney's fees and expenses.
Accordingly, the judgment of the trial court is affirmed, costs to be paid by defendants-appellants, Vernon V. and James R. Poche.
Affirmed.